294 So.2d 788 (1974)
DUNAVANT ENTERPRISES, INC.
v.
John B. FORD.
No. 47517.
Supreme Court of Mississippi.
May 13, 1974.
Rehearing Denied June 10, 1974.
Lomax B. Lamb, Jr., Marks, Thomas F. Johnston, Memphis, Tenn., for appellant.
Caldwell & Lewis, Marks, for appellee.
INZER, Justice:
This is an appeal by Dunavant Enterprises, Inc. from a decree of the Chancery Court of Quitman County dismissing a bill of complaint against John B. Ford seeking damages for a breach of contract. We affirm.
The bill of complaint and the amendment thereto allege that early in 1971 the defendant John B. Ford, referred to as Ford, acting by and through his agent, Bluff City Cotton Company, entered into a written contract with W.B. Dunavant & Co., a partnership, to sell all the cotton produced by Ford on approximately 1,600 acres of land to be planted in Quitman County, Mississippi, *789 with the exception of cotton having a micronaire of 5.2 and certain other exceptions set out in the contract. It was alleged that after the execution of the contract, W.B. Dunavant & Co. was liquidated and merged into Dunavant Enterprises, Inc., a corporation, sometimes referred to as Dunavant, which assumed all the rights and liabilities of the partnership. It was alleged that Ford actually harvested 2,101 bales of cotton off of 1,590.1 acres in Quitman County and that he failed to deliver the cotton harvested from 350.8 acres and that 550 bales produced on this acreage were sold to other cotton buyers. The bill of complaint sought specific performance of the contract and discovery to ascertain the amount of cotton, the grade, the value, the date of harvest and the location of the warehouse receipts. The bill of complaint also sought to recover damages sustained by complainant for the failure of the defendant to deliver and sell to it all the cotton grown under the contract. A copy of the contract was made an exhibit to the bill of complaint and the pertinent part of the contract is as follows:
THIS CONTRACT made and entered into this the 1st day of February by and between John Ford hereinafter referred to as Seller and W.B. DUNAVANT & COMPANY of Memphis, Tennessee, hereinafter referred to as BUYER.
WITNESSETH:
1. On the terms and conditions and at prices hereinafter stated, the seller agrees to sell, and the BUYER agrees to buy, all and only the cotton produced by Seller during the crop year 1971 on approximately 1,600 acres situated in Marks, Miss.

* * * * * *
3. Seller agrees to practice normal, good farming methods in the production and harvesting of the crop, to defoliate before machine picking and to harvest and gin as fast as practicable after maturity. BUYER has the privilege of controlling, within reason, the amount of heat and cleaning equipment to be used in ginning the cotton. Seller agrees further to cooperate in harvesting, handling and ginning the cotton.
The contract then fixed the price to be paid for the cotton upon delivery and provided "no cotton to be delivered on this contract after December 1, 1971." The contract contains other provisions and the final paragraph is as follows:
10. We, the seller, and the BUYER, have carefully read and fully understand the terms and provisions of the foregoing contract, which represents the entire agreement between the parties, and understand further that there may be no modification of this agreement except in writing.
The blank spaces in the form contract for the date were not filled in, but there is no dispute relative to the date it was signed or the fact that it was signed by both parties.
Ford answered and denied that he had breached the contract in question and alleged because of adverse weather conditions over which he had no control, that he had been unable to plant the entire 1,600 acres of cotton covered by the contract. As a result, he had been able to plant only 1,250 acres in cotton and had delivered all the cotton produced on the land covered by the contract. Appellee by way of cross bill alleged that at the time appellant filed his bill of complaint, it knew that appellee had complied in every respect with its contract. Appellant also knew or had knowledge that appellee was unable to plant the full 1,600 acres covered by the contract due to acts of God over which he had no control. It was further alleged that in spite of this knowledge, appellant filed this suit for the purpose of harassment and in an attempt to bring ill-repute to appellee and to prevent him from securing finances with which to operate his farming operations. The cross bill sought to recover both actual and punitive damages.
Since the chancellor resolved the conflict in the evidence in favor of appellee, the *790 facts will be stated in the light most favorable to the appellee. In January 1971, L.B. Strong of Bluff City Cotton Company, an F.O.B. cotton merchant, negotiated the contract in question. Ford had for a number of years sold his cotton through Bluff City and had paid them a commission for selling the cotton for him. While Ford was in the hospital in Memphis, Strong approached him about buying his cotton for the crop year 1971. Ford advised Strong that he intended to plant 1,800 or 1,900 acres of cotton and that he could not sell the cotton that he planned to grow on land which he was renting on a share basis. Thereafter, Strong approached Dunavant and asked them if they wanted to buy approximately 1,600 acres of cotton to be produced by Ford. Dunavant then prepared the contract here in question setting out the terms upon which it would buy the cotton. The contract was signed by an authorized agent of Dunavant, and it was turned over to Strong to have Ford sign it. When it was presented to Ford, who was still in the hospital, he told Strong that he did not know whether he would have as much as 1,600 acres excluding the land that he was renting on a share basis. Strong assured him that it would not make any difference, and Ford signed the contract. Ford's health continued to be bad, and he had to leave most of the farming operation up to his son, who was a partner in the farming operations. In May 1971, Ford wrote a letter which Dunavant was unable to locate at the time of the trial. It was Ford's recollection that he wrote Dunavant to inform them that he did not think he would be able to plant the full 1,600 acres due to health and weather conditions. Evidently, he also told Dunavant in the letter that he was contemplating leasing a part of his land because Dunavant wrote him that they expected him to deliver the cotton produced on the land that he had leased to other parties or pay the difference in the then established market price. Dunavant sent a copy of this letter to Strong. Later, Ford informed Strong that he had gotten the letter from Dunavant and asked Strong to call Dunavant and tell them that things looked better and that he would have more cotton than he thought when he wrote the letter. Strong complied with this request. At that time, the acreage that Ford had planted had not been measured, and he did not know exactly how much acreage had actually been planted. There is no dispute in the evidence relative to the fact that it rained eight or nine inches and that the weather was cold during the month of May in the area where Ford's land was located. Ford planted all the cotton he could on the home place, which was the place where he intended to plant the cotton which was covered by the contract. Due to the nature of the land and the weather conditions, he was only able to plant about 1,250 acres. It is also undisputed that it is not good farming practice to plant cotton in this area after the first of June and that Ford planted all he could prior to that date.
The chancellor held that parol evidence was admissible to show what acreage was intended to be covered by the contract, since there was not 1,600 acres of cotton land located in Marks. He further found from the evidence that the contract did not cover the land which Ford was renting on a share basis and that due to the force of nature, Ford was not able to plant the full acreage that he contracted to plant, although he did all he could reasonably do to get the entire acreage planted. He further found that Ford delivered to Dunavant all the cotton produced on the land covered by the contract and that his failure to plant the entire 1,600 acres was due to an act of God (weather conditions) over which Ford had no control and that he made every reasonable effort to comply with the contract. The chancellor concluded that under these circumstances, Ford did not breach the contract. The chancellor also pointed out that the failure of Dunavant, who prepared the contract, to properly describe the land upon which the cotton was to be grown *791 was the underlying cause of the dispute between the parties.
A decree was entered dismissing the bill of complaint and the cross bill. From this decree, Dunavant appealed. Ford did not cross appeal and the only question involved is whether the chancellor was in error in dismissing the bill of complaint.
Appellant advances two propositions for the reversal of this case: (1) that the ruling of the trial court was contrary to the law and the evidence, and (2) that the trial court erred in denying the motion for rehearing.
Under Proposition I appellant argues that the issue in this case is simple  an ordinary breach of contract. Appellant urges the material facts reveal that on about February 1, 1971, Ford signed the contract under which he committed himself to sell appellant all the cotton produced by him on approximately 1,600 acres of land. Ford harvested the cotton in 1971 from 1,590.1 acres but that Ford actually delivered and sold appellant cotton grown only on 1,239.3 acres. Ford withheld from delivery 486 bales grown by him on 350.8 acres of land which he sold to other parties. Consequently, appellant concludes that under these facts, it was entitled to recover damages for the breach of contract. This case probably would be that simple had appellant properly described the farm or the particular land upon which the cotton was to be produced. The contract called for cotton to be produced on 1,600 acres situated in Marks, Mississippi, but now appellant contends that the contract covers any 1,600 acres of cotton grown by appellant in Quitman County. To say the least about the description in the loosely drawn contract is that it opened the door for parol testimony, and the chancellor found from the testimony that the cotton grown by the appellee on the 350.8 acres of land rented by Ford from other landowners on a share basis was not covered by the contract. After a careful review of the evidence in this case, we cannot say that he was manifestly wrong in so finding.
It is also argued that since the contract was executed in Tennessee that it should be construed in accordance with the Tennessee law. The reason for this argument is that Tennessee in adopting the Uniform Commercial Code did not adopt the section dealing with force majeure. We are of the opinion that the chancellor was correct in applying the law of this state. Although the contract was executed in Tennessee the cotton was to be grown, harvested and delivered in Mississippi. Mississippi Code Annotated Section 75-1-105 (1972), provides:
(1) Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement, this code applies to transactions bearing an appropriate relation to this state.
(2) Where one of the following provisions of this code specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules) so specified.
The contract contained no agreement as to which state law would apply. Therefore, it was for the determination of the trial court which law it would apply. It cannot be successfully argued that the transaction does not bear a reasonable relation to this state. The holding of the trial court is consistent with the pronouncement of this Court on the "center of gravity" doctrine. See Craig v. Columbus Compress & Warehouse Co., 210 So.2d 645 (Miss. 1968). Furthermore, in reality there is no conflict between the laws of this state and the Tennessee law as to the question here involved. The comment to the official text of the Uniform Commercial *792 Code codified in Section 47-2-615 of the Tennessee code states:
9. The case of a farmer who has contracted to sell crops to be grown on designated land may be regarded as falling either within the section on casualty to identified goods or this section, and he may be excused, when there is a failure of the specific crop, either on the basis of the destruction of identified goods or because of the failure of a basic assumption of the contract.
The foregoing comment is not inconsistent with the proper rule to be applied to contracts relative to crops to be grown in the future. The rule is that if the parties contract for the purchase and sale of all or a part of a particular crop to be grown in the future from a particular tract or tracts of land and by reason of weather conditions or other forces of nature the seller is unable to plant all or part of the crop or if all or part of the crop fails or is destroyed by conditions beyond the control of the seller, nonperformance to the extent of the failure is excused in the absence of an expressed condition in the contract to the contrary. The reason for this rule is that the parties to the contract for the sale of a crop to be grown in the future are well aware of the fact that weather and other conditions of nature control to a large extent the ability of the seller to grow and harvest the crop contemplated. Therefore, the absence of an express condition in the contract to the contrary, the foregoing rule is an implied condition of the contract.
We find no merit in appellant's second proposition that the trial court was in error in denying its motion for rehearing. The record shows that the final decree was entered in this cause on October 23, 1972. Notice was promptly given to the court reporter to transcribe her notes. On November 6, 1972, appellant filed its appeal bond which was approved by the clerk and thus perfected the appeal. Thereafter on November 13, 1972, appelland filed a motion for a rehearing, and on November 17, 1972, it filed an amendment to the motion for a rehearing. In spite of the objection of appellee, the court conducted an evidentiary hearing on the motion. The principal thrust of the appellant's motion was that it had located the letter which appellee had written in May 1971 to appellant and that this letter contradicted appellee's testimony given during the course of the trial. The court after hearing the evidence entered an order denying the motion for rehearing. Appellant argues that the contents of this letter contradict the testimony of the appellee to the extent that the chancellor should have granted a rehearing. The chancellor evidently did not think that the contents were such that would make any difference in his decision, since he entertained the motion for a rehearing and denied it. However, it is well settled that when a final decree is entered and an appeal is perfected, the trial court no longer has jurisdiction of the cause. The only error that the trial court made in this regard was in entertaining the motion for a rehearing after the appeal had been perfected. It certainly was not error for him to deny it.
For the reasons stated, we are of the opinion that this case should be and it is affirmed.
Affirmed.
GILLESPIE, C.J., and PATTERSON, WALKER and BROOM, JJ., concur.