NOONAN CONSTRUCTION COMPANY, INC., Plaintiff–Appellant Cross–Appellee,

v.

WARREN BROTHERS COMPANY, Defendant–Appellee Cross–Appellant.

No. 79–2401.

United States Court of Appeals, Fifth Circuit. Unit A

Dec. 15, 1980.

David W. Mockbee, Jackson, Miss., for Noonan Const. Co., Inc.

Pat H. Scanlon, Jackson, Miss., for Warren Bros. Co.

Before COLEMAN, Chief Judge, RUBIN and WILLIAMS, Circuit Judges.

PER CURIAM:

In August 1976 Noonan Construction, Inc., bid on a contract to pave a ten mile stretch of U.S. Highway 49, south of Yazoo City, Mississippi. The bid, based partly on cost estimates for sand and gravel to be supplied by Warren Brothers Company, was the lowest offered and Noonan was awarded the contract. As hereinafter appears, the contract experience turned out not to be all peaches and cream.

In late 1976, after preliminary discussions, Warren sent Noonan its standard form contract, specifying prices for washed gravel and washed sand for all of Noonan's needs for the Yazoo project.

On January 3, 1977, Noonan and W. E. Blain & Sons, Inc., entered into a joint venture agreement wherein Blain was to lay the soil cement base upon which Noonan would lay down the concrete paving after waiting seven days for the soil cement to "cure".

After being awarded the Yazoo County contract, Noonan sought and obtained another highway paving project, some 200 miles away in Marshall County, Mississippi. The fly in that ointment was that Noonan had only one mobile paving unit, whereas it had obligated itself to do two widely separated paving jobs. Consequently, Noonan had to complete the Yazoo project before it could move to and begin work on the Marshall County project. It planned to do the Yazoo paving from June to the end of August, 1977, thereafter beginning the Marshall County project in the middle of September. Noonan testified that rain and freezing weather will slow down and ultimately halt paving work; therefore, Noonan needed to finish the Yazoo County project and thereafter begin the Marshall County project in time to finish it before cold weather halted work for the winter.

Just how much Warren knew of Noonan's Marshall County project is the subject of dispute. Noonan did get sand and gravel estimates for the Marshall County project from Warren, although it ultimately subcontracted this to someone else. Warren says these estimates came from its Memphis

office and that its Mississippi office had no actual notice of the Marshall County project. Noonan says it discussed its telescoped time schedule with the President of Warren's Mississippi branch, Dick Durgan.

The standard form contract which Warren sent Noonan provided on its face that "This proposal shall be void if not accepted within thirty days after the date hereof as set forth above," but it carried no date; it is undisputed, however, that the contract form was sent and received in late 1976.

Noonan claims that its President, W. J. Noonan, Jr., talked with Dick Durgan, of Warren, about two details in the contract which Noonan wanted changed: (1) Noonan, rather than Warren, would deliver the sand and gravel to the project site and (2) Noonan needed a specified minimum amount of said and gravel per day. Warren denies that such pre–contract oral discussions ever took place.

Ultimately, Noonan signed the Warren contract, dated it 22 March 1977, and returned it after striking the following sentence: "Warren agrees to haul material to Noonan's stockpile & dump (not stockpile) for an additional compensation of $0.35 per ton." Along with the amended contract Noonan sent along a cover letter dated 24 March 1977, addressed to Mr. David Barton (of Warren Brothers). The cover letter included this sentence: "In accordance with my recent discussions with Dick Durgan, we will haul this material in our trucks per your original quotation, and *we need to haul a daily minimum of 2000 tons* in an approximate ratio of 2 gravel and 1 sand." [Emphasis added.]

Upon receiving the amended contract and the cover letter, Warren gave no notice of rejecting the contract although it could have done so because it had been returned more than 30 days after its receipt by Noonan. Warren went along with Noonan's offer to haul the sand and gravel in its own trucks. It made no response to Noonan's letter assertion that it needed a minimum of 1333.3 tons of gravel and 666.7 tons of sand per day.

So far, so good–as dealings between contractors generally go. But the end is not yet.

Warren's machinery began to break down and Noonan began to pressure Warren for the minimum amount of sand and gravel. Warren did not deny that it obligated itself to provide the desired minimum. Rather, Warren made substantial efforts to supply Noonan with the 2000 tons of gravel and sand at a ratio of 2 gravel to 1 sand.

The contract between Warren and Noonan had not specified when production of sand and gravel would begin or when Noonan would begin paving. Although Noonan put its equipment on Warren's property as allowed by the contract, and although it claims it intended to begin paving in mid–June, no paving was actually begun until July 17, 1977. Blain, whose work had to be done before Noonan could do the paving, began in early 1977 and was finished by September 27, 1977, although it appears from the record that Blain finished the "main line" work on August 15.

Noonan claims that between June 18 and September 27, 1977, there were forty two days in which Warren failed to provide the minimum amount of sand and gravel. Because of this delay, says Noonan, the Yazoo County project which should have been finished by September 1, 1977, was delayed until September 27, 1977. Hence work could not begin on the Marshall County project until October 7. This late start, combined with poor weather in Marshall County, delayed the completion of that project until March 23, 1978. Apparently, the "main line" work was completed by December 15 but the off ramps could not be completed until March 23, 1978.

Noonan withheld the last payment due Warren September 15, 1977 ($100,912.40). On March 2, 1978, Noonan filed a diversity action charging Warren with breach of contract and common law negligence. The breach of contract action was based on Warren's failure to furnish the minimum amount of sand and gravel assertedly required by the contract and Noonan's cover letter. The alleged negligence was that

Warren had failed to exercise due care in maintaining its own equipment and thus delayed delivery of the material. Noonan asked for $242,314.54 damages.

Warren counterclaimed for the unpaid $100,912.40 and for interest and attorney's fees.

The case was tried to judge and jury April 26, 27 and 30, 1979. There was a directed verdict for Warren on Noonan's negligence claim. The alleged breach of contract and Warren's counterclaim went to the jury. It found for Warren in all respects, finding no breach of contract, and awarding Warren $129,581.11 on the counterclaim, plus $10,000 attorney's fees.

Except for the judgment on the counterclaim, the unhorsed plaintiff appeals, claiming that because of three errors a new trial is required: (1) in not allowing Noonan to introduce into evidence the cover letter which was sent along with the signed contract; (2) in directing a verdict for Warren on the negligence question; and (3) in granting certain jury instructions offered by Warren while rejecting others offered by Noonan.

Considering the possibility that this Court might order a new trial, Warren perfected its own cross–appeal, asserting that the trial court erred (1) in not granting its motion for a summary judgment on all counts and (2) in allowing the jury to hear evidence of damages Noonan claimed to have suffered because of the delay in its Marshall County project, a contract to which Warren was not a party. Since we are of the view that the judgment rejecting Noonan's claims should be affirmed, we dismiss the Warren cross appeal as moot.

The contract sued upon contains several exculpatory clauses and it seems quite clear to us that Noonan's claim of negligence is no more than a rewording of the breach of contract claim in an effort to avoid the effect of the exculpatory clauses.

### Negligence Claim

We are constrained to hold that the directed verdict for Warren on the negligence claim passes the test of *Boeing v. Shipman*, 411 F.2d 365 (5th Cir. 1969).

Noonan's assertions of negligence concern Warren's maintenance of its equipment, chiefly the dredger, a huge piece of machinery on a barge 40–45 feet by 18 feet, floating in a pond. In order for the dredger to operate, it must float in at least ten feet of water. If the water level falls below ten feet, then water must be pumped into the pond.

The dredger lowers a pump to the bottom of the pond to draw upwards that which is on the bottom. Aside from debris, the dredger usually brings up clay, sand, and gravel. The first step is to remove the "overburden", a layer of dirt at the bottom of the pond containing no gravel. Then a machine must separate the clay gravel from what is used in highway paving, "washed gravel". The material brought up is extremely abrasive and places extreme strain on the extracting machinery.

Testimony in the record indicates the efficiency of the extraction of washed gravel varies, depending upon the operator's *luck* in the placement of the dredger. The state of the technology is such that finding a good source of gravel can be a "hit or miss" proposition. The pond ·bottom can vary from as little as 30% gravel and 70% sand to 60% gravel and 40% sand. The overburden can be minimal or very thick. The mud on the gravel can vary in its ability to stick to the gravel and thereby can lengthen the time necessary to wash it off.

The supervisor of Warren's operations in Yazoo County, Wayne Johnson, testified that prior to the Noonan project he had not had any unusual problems with the dredger or its engine. The problems began in the summer of 1977. The dredger was in a different location. There it uncovered a 40–60 foot layer of overburden, which had to be stripped before gravel of any kind could be removed. The removed clay gravel and washed gravel was covered with a red mud which was very difficult to remove. Many machines broke down repeatedly. Mr. Johnson's frustrations with these problems are recorded in detail in a

diary he kept in the summer of 1977, which Noonan seeks to use as supporting its negligence case.

We have read those passages from Mr. Johnson's diary but we are unable to see how a reasonable minded jury could have read them as an admission by Johnson of his negligence, or as an indictment of Warren for negligence, in maintaining the machinery or in not replacing the dredger. Rather, the diary, as reinforced by Mr. Johnson's answers on cross–examination, shows a conscientious employee doing the best he could to cope with unexpected machinery breakdowns.

Once Warren realized the seriousness of the Yazoo problem, it took strenuous and costly steps in an effort to meet Noonan's sand and gravel requirements. On July 11, 1977, before Noonan began paving, Warren went to shifts around the clock, the first time it had ever done that. Several times, it cut off all other customers in order to deliver all of its production to Noonan. It brought in a new crew of workers from Columbus, Mississippi, in an attempt to step up production with fresh workers. It brought in experts to analyze its maintenance problems and help resolve them. These experts included one of its vice–presidents from Atlanta, as well as an independent contractor and a gravel expert. When it needed spare parts not on location, it dispatched an airplane to bring in the parts. It solicited suggestions from Noonan's experts.

Except for Johnson's diary, Noonan offered only the opinion testimony of its supervisory personnel. Neil Davis, Noonan's Concrete Paving Supervisor, testified he believed Warren's methods of repair were inefficient. In his opinion, too many people were involved in each repair. Were it up to him he would have assigned some of the repair people to preventive maintenance. Mr. William Biggs, Paving Manager, echoed these criticisms and added that he believed Warren was not doing enough preventive maintenance. In his opinion, Warren did not stock enough spare parts. Mr. Biggs admitted that the repair people seemed to

work very hard and that he could not say that attempting to repair the dredger before replacing it was a negligent act. Biggs further admitted that during his deposition he had stated that Warren seemed to do everything humanly possible to repair its machinery.

In its case in chief Noonan offered no evidence of the standard of care required of a dredging business in Warren's position nor how Warren had breached such a standard. It emphasized that Warren's supervisory personnel did not know how old the dredger was and had not kept a history of its repairs, but then had to admit that it didn't have similar information on its own heavy machinery which was similarly prone to breakdowns.

Based upon the above, we agree with the District Court that on the evidence in this record no reasonable minded jury could have found Warren negligent in the maintenance of its machinery.

The directed verdict on the negligence issue is affirmed.

### Breach of Contract

The Noonan–Warren contract contains an exculpatory clause:

> We are not responsible for failure to make delivery when prevented by strikes, labor troubles, accident or *necessary repairs to machinery* ... or by reason of any other causes beyond our control. In the event any contingency should occur, seller preserves the right to determine the order of priority of deliveries to its purchasers. [Emphasis added.]

This clause is reflective of Mississippi's *force majeure* statute, Miss.Code of 1972, § 75–2–617, which is part of its Uniform Commercial Code. It states:

> Deliveries may be suspended by either party in case of ... breakage of machinery or apparatus ... or any cause beyond the control of such party, preventing the manufacture, shipment, acceptance, or consumption of the shipment of the goods.... Such deliveries so suspended shall be cancelled without liability, but

the contract shall otherwise remain unaffected.

Noonan's theory of contract liability is that Warren agreed to furnish it 2000 tons of gravel and sand at a 2 to 1 ratio and breached this agreement. Noonan argues that *force majeure* does not apply because the machinery breakdowns were not due to forces beyond Warren's control; further, that Warren's was not a failure to "deliver" but rather a failure to "produce."

■ Since there was no reasonable evidentiary basis for the claim that Warren's maintenance of its machinery was negligent, there is no room for Noonan's argument that the breakdowns in Warren's machinery were its fault instead of being caused by forces beyond its control.

■ Noonan's argument that Warren's actions are not protected by either the exculpatory clause in the contract or by the statutory *force majeure* clause must similarly fail. We do not find any basis in Mississippi law for Noonan's attempted distinction between "production" and "delivery," *see Dunavant Enterprises, Inc. v. Ford*, 294 So.2d 788 (Miss.1974); *Paymaster Oil Mill Co. v. Mitchell*, 319 So.2d 652 (Miss. 1975). Even if we were to assume, *arguendo*, that the distinction between "delivery" and "production" avoids the effect of the contractual exculpatory clause, it does not avoid the effect of Mississippi Code § 75–2–617. This statute specifically provides for the situation in this case, stating that "Deliveries may be suspended . . . in case of . . . breakage of machinery or apparatus . . . [resulting from] any cause beyond the control of such party, preventing the *manufacture* of the goods. . . . Such deliveries so suspended shall be cancelled without liability. . . ." [Emphasis added.]

The jury found against Noonan on its breach of contract theory.

■ Noonan argues, however, that it would have found differently had it been able to see the April 25 cover letter, excluded by the District Court. The exclusion of this letter, if error, was harmless. Its admission could have made more likely a finding that Warren agreed to provide Noonan 2000 tons of sand and gravel per day, but liability would still have been barred by the exculpatory clause in the contract and by Mississippi's *force majeure* statute.

Noonan complains of five jury instructions, two of which it offered and the Court refused and three of which Warren offered and the Court accepted. The main point of the five jury instructions concerned the applicability of the contractual exculpatory clause and Mississippi's *force majeure* statute to the facts of this case. Having reviewed the instructions, we find the Court's actions correct in all respects.

### Conclusion

What it all comes down to is that while both Warren and Noonan clearly had a very unhappy experience we see no legal reason for upsetting the directed verdict and the findings of the trial jury that Warren was not liable for damages on account of it.

AFFIRMED as to Noonan's complaint. Warren's cross appeal is DISMISSED.